110    APPELLATE COURTS OF ILLINOIS.

Felt et al. v. U. S. Mortgage & Trust Co., 231 Ill. App. 110.

Charles J. Felt and Charles E. Dickinson, Appellees,
v. United States Mortgage & Trust Company et al.,
on appeal of Illinois Merchants Trust Company,
Trustee, Appellant.

Gen. No. 29,087.

1. CONSPIRACY—*sufficiency of allegations of conspiracy in bill to
enjoin sale under trust indenture.* Allegations in a bill by minority
shareholders in a participating collateral trust agreement, to enjoin
the pledgee of the trust securities under a trust indenture from
selling them under the indenture, that the defendants conspired
and confederated among themselves "to so manage and control"
the trust and the affairs of the debtor corporations whose stocks
are pledged that the creditor corporation and holders of notes
issued under the indenture "would eventually obtain ownership
and control" of the debtor corporations are allegations of opinions
and conclusions in the absence of any allegations of specific facts
and are insufficient to authorize the granting of temporary injunc-
tion restraining the pledgee from selling the securities under the
indenture.

2. CONSPIRACY—*allegation of interlocking interest of defendants
insufficient to show conspiracy.* A temporary injunction restrain-
ing the pledgee of corporate stocks under a trust indenture from
selling the stocks under the indenture on the ground of conspiracy
between the defendants to improperly manage and control the
affairs of the corporations whose stocks are pledged so that the
ownership of the corporations will fall to the creditor corporation
and the defendants, cannot be sustained on allegations in the bill
which merely show the interlocking business relations and inter-
ests of the defendants in the control of the various corporations
involved, in the absence of allegations of specific facts showing
conspiracy.

3. CONSPIRACY—*general allegations of mismanagement of cor-
poration affairs insufficient to show conspiracy.* General allegations
in a bill by minority shareholders in a participating collateral
trust agreement covering the capital stock of certain corporations
which has been pledged under a trust indenture to secure notes
issued for the purchase of the stock, to enjoin the pledgee from
selling the stock under the indenture, that defendants, pursuant to
an alleged conspiracy, have withheld from complainants knowledge
as to earnings of the corporations, have made misleading reports,
have expended the funds of the corporations unnecessarily and im-

providently, and made improvident loans of corporate funds, and that because of the resulting financial condition it is proposed to sell the stocks under the indenture and consummate a proposed reorganization "to reap the harvest of such conspiracy," are insufficient to sustain a temporary injunction restraining sale by the pledgee, in the absence of specific allegations, and where it appears that the investments and loans were authorized under the collateral trust agreement and there is no allegation that complainants sought or were refused information as to the affairs of the corporations.

4. CONSPIRACY—*not inferable from acts sanctioned by complainants.* The issuance of certain notes pursuant to a collateral trust agreement as a part of trust scheme to acquire the stocks of certain corporations for the purposes of the trust agreement, which was assented to and sanctioned by the stockholders and the participating shareholders in the collateral trust, which received the proceeds of the notes and acquired the stocks in question, cannot be made the basis of a charge of conspiracy by participating shareholders on a bill to enjoin sale of the stocks under the trust indenture given to secure the notes.

5. CONSPIRACY—*general allegations of conspiracy insufficient to enjoin sale under pledge.* General allegations in a bill to enjoin sale of corporate securities held pursuant to a trust indenture under the terms thereof is sought to be enjoined, on the ground of conspiracy, that the pledgors, as part of the conspiracy, caused additional securities to be pledged under the trust agreement as the result of an extension agreement covering certain unpaid indebtedness arising under the trust agreement, are insufficient to warrant a temporary injunction where it is not alleged that the extension was unnecessary, or that certain debentures, issued as part of the trust scheme upon which the interest was unpaid, were unnecessary or that the trustee did not receive therefor a proper *quid pro quo.*

6. INJUNCTIONS—*allegation of opinion insufficient to support injunction.* An allegation in a bill to enjoin a pledgee under a trust indenture from selling the trust assets pursuant to the terms of the agreement, that the pledgee is merely the agent of alleged conspirators named, without any allegation of facts, is a mere statement of opinion and is insufficient to support a restraining order.

7. INJUNCTIONS—*general allegations insufficient to support injunction against sale under trust indenture.* A sale of trust assets held by a pledgee under a trust indenture cannot be enjoined on a bill alleging generally that the defendants have conspired to depreciate the securities in question to the end that at the sale thereof the conspirators or corporations represented by them may secure entire control and ownership of the corporations whose stocks

constitute the trust assets, by means of a prospective reorganization after the sale, where the proposed reorganization is contingent upon the possible purchase of the assets by the alleged conspirators at the contemplated sale by the trustee, and the allegations of conspiracy are vague and general and in part based upon inferences to be drawn from the proposed plan of reorganization.

8. CORPORATIONS—*agreement vesting sole voting power of corporate stock in trustees illegal.* A collateral trust agreement under which the capital stock of three corporations was held in trust for the purposes of the agreement with the complete and absolute power in regard to the stock, including the sole voting power thereof, vested in the trustees, who were not required to have any substantial or pecuniary interest in the stock, constitutes, to that extent, an illegal voting trust in violation of the Constitution, art. XI, relative to election of directors or managers of corporations.

9. INJUNCTIONS—*participants in illegal trust agreement not entitled to injunctive relief therefrom.* Holders of preferred participating certificates in a collateral trust organized to hold the stock of certain corporations under a collateral trust agreement which vested the trustees with absolute control of such stock, including the sole voting power, are not entitled to an injunction restraining the pledgee of such stock, to secure notes given for the consummation of the trust scheme, from selling such stock under the terms of the pledge, since such participating shareholders, being *in pari delicto* with the trustees in the illegal trust agreement, do not come into equity with clean hands.

Interlocutory appeal by defendant from the Circuit Court of Cook county; the Hon. HUGO M. FRIEND, Judge, presiding. Heard in the third division of this court for the first district at the October term, 1923. Reversed. Opinion filed December 19, 1923.

McCULLOCH, McCULLOCH & DUNBAR and ROBBINS, TOWNLEY & WILD, for appellant.

URION, DRUCKER, REICHMANN & BOUTELL, for appellees.

MR. PRESIDING JUSTICE TAYLOR delivered the opinion of the court.

On September 29, 1923, the complainants, Charles J. Felt and Charles E. Dickinson, of the City of Chicago, filed an original bill of complaint, and on October 9, 1923, an amendment to that bill of complaint,

in the circuit court of Cook county, in behalf of themselves and all other holders and owners of preferred participation shares in a certain trust designated as the "Chicago Elevated Railways Collateral Trust," who were similarly situated, for the purpose (1) of removing the present trustee, the United States Mortgage & Trust Company, and the appointment of a new trustee, or a receiver; (2) of obtaining an accounting of the United States Mortgage & Trust Company and F. A. Vanderlip, Henry A. Blair, Samuel McRoberts and Samuel Insull, as trustees; (3) of having adjudged that the holding of all of the outstanding shares of the capital stock of certain corporations by the trustees was unlawful, and that the pledge thereof to the Illinois Trust & Savings Bank, as trustee, was invalid; (4) of having an accounting of the assets and liabilities of the Chicago Elevated Railways Collateral Trust; (5) of dissolving and terminating the Chicago Elevated Railways Collateral Trust, and distributing the assets thereof among the holders of its preferred and common participation shares after the payment of its debts; (6) of obtaining a writ of injunction restraining the Illinois Merchants Trust Company (sole appellant) from selling or attempting to sell, at public or private sale, any of the assets of the Chicago Elevated Railways Collateral Trust pledged by it to the Illinois Trust & Savings Bank under trust indenture made July 1, 1914, and an extension agreement dated June 19, 1916; (7) of restraining by injunction the United States Mortgage & Trust Company from turning over to the Illinois Merchants Trust Company, or any representative or holder of notes or debentures of the Chicago Elevated Railways Collateral Trust, any of the assets of the Chicago Elevated Railways Collateral Trust until further order of the court; and (8) of obtaining a permanent decree in accordance with the prayer of the bill of complaint.

On October 10, 1923, on motion of the solicitors for

the complainants, after notice to the Illinois Merchants Trust Company, and upon a reading of the bill of complaint and amendment thereto, and after hearing arguments of counsel for complainants, and of counsel for the Illinois Merchants Trust Company, and of counsel for the defendants, Charles E. Mitchell, George M. Reynolds, John H. Mason and R. Floyd Clinch, the committee of note holders, the chancellor ordered an injunction *pendente lite* against the Illinois Merchants Trust Company, restraining it from selling or attempting to sell, at public or private sale, any of the assets of the Chicago Elevated Railways Collateral Trust which had been pledged under the trust indenture of July 1, 1914, and the extension agreement of June 19, 1916, until the further order of the court. The injunction bond of the complainants was fixed at $5,000.

This appeal is by the Illinois Merchants Trust Company from the interlocutory order granting an injunction *pendente lite* on the face of the bill as amended.

The defendants to the bill of complaint as amended are as follows: The United States Mortgage & Trust Company, a New York corporation, as sole trustee of the Chicago Elevated Railways Collateral Trust under an agreement and declaration of trust dated June 30, 1911; Samuel Insull, Henry A. Blair, F. A. Vanderlip and Samuel McRoberts, individually and as trustees under the declaration of trust of June 30, 1911; the Commonwealth Edison Company; Charles E. Mitchell, George M. Reynolds, John H. Mason and R. Floyd Clinch, representatives of holders of certain notes of the Chicago Elevated Railways Collateral Trust issued under trust indenture dated July 1, 1914, and acting under a note holders' protective agreement, dated June 14, 1919, and under a certain plan and reorganization agreement dated July 14, 1923; Illinois Merchants Trust Company, a corporation, as trustee under a certain trust indenture dated July 1, 1914,

made by and between Frank A. Vanderlip, Samuel Mc-
Roberts and Henry A. Blair, and the Illinois Trust &
Savings Bank; Samuel Insull, Edward J. Doyle, Brit-
ton I. Budd, William A. Fox and John H. Gulick,
as directors of the South Side Elevated Railroad
Company, of the Northwestern Elevated Railroad
Company, and of the Metropolitan West Side Elevated
Railway Company, and the unknown owners and hold-
ers of certain notes, debentures and common and pre-
ferred participation shares.

The bill of complaint as amended sets forth substan-
tially the following:

On June 30, 1911, a certain agreement and declara-
tion of trust was made between Henry A. Blair, of
Chicago, party of the first part, Gardner, Dumaine
and Hart, of Massachusetts, as trustees, parties of the
second part, and the holders from time to time of cer-
tificates of participation shares to be issued there-
under, parties of the third part. A copy of the agree-
ment and declaration of trust is attached to the bill
of complaint. The trust created by said agreement
and declaration of trust of June 30, 1911, was desig-
nated the "Chicago Elevated Railways Collateral
Trust." It will be referred to hereinafter as the "Col-
lateral Trust." The agreement and declaration of
trust provided for the acquisition by the three trus-
tees of shares of the capital stock, bonds and other
securities of and claims against certain corporations
owning or operating elevated railway properties in
the City of Chicago. It provided that the trustees
should hold the legal title to the property comprising
the trust estate, and should have complete manage-
ment and control of the trust estate, with power to
appoint their successors, without power or authority
of the holders of participation shares of the trust
to direct or control the acts or management of the
trustees. It provided that the beneficial interest in
the trust estate should be in the holders of the partici-

pation shares to be issued under the trust, and that participation shares should be issued as follows: 160,000 preferred shares and 250,000 common shares, each of said shares to be of the par value of $100.

The complainant Charles J. Felt is the owner and holder of 445 and Charles E. Dickinson of 100 of the preferred participation shares of the Collateral Trust. They, together with all the other owners and holders of the preferred and common participation shares, are the beneficial owners of all the assets held by the trustees under the Collateral Trust.

The original trustees of the Collateral Trust, Gardner, Dumaine and Hart, sometime in the year 1911, were succeeded by the defendants Blair, Vanderlip and McRoberts. The latter constituted the trustees from the year 1911 to the year 1915. From 1915 to 1916 the defendant Insull and one William G. Beale and the defendant McRoberts constituted the trustees. From 1916 to sometime in 1923, the exact time is not stated, Insull and William G. Beale constituted the trustees. Beale died March 2, 1923, leaving Insull the sole trustee. Insull then, the exact time is not stated, appointed the United States Mortgage & Trust Company as trustee; that company is now acting as the sole trustee of the collateral trust.

As the result of the creation of the Collateral Trust on June 30, 1911, the trustees, or their successors, acquired and became the holders of record of all of the outstanding shares of the capital stock of certain corporations. Those holdings were as follows:

| Name of Corporation. | Class of Stock. | Number of Shares. | Par Value. |
|---|---|---|---|
| The Metropolitan West Side Elevated Railway Company | Preferred | 87,075 | $8,707,500 |
| " | Common | 74,628 | 7,462,800 |

| Northwestern Elevated | | | |
|---|---|---|---|
| Railroad Company | Preferred | 49,444 | 4,944,400 |
| ,, | Common | 49,464 | 4,946,400 |
| South Side Elevated | | | |
| Railroad Company | | 102,314 | 10,231,400 |

By the terms of the Collateral Trust it was provided that the trustees should forthwith enter into an agreement with the Illinois Trust & Savings Bank (now the Illinois Merchants Trust Company), as trustee, and by it pledge to that bank as trustee all the above-mentioned stocks and certain other securities to secure the payment of collateral notes which were to be executed by the original trustees of the Collateral Trust, amounting in the aggregate to $30,000,000, dated July 1, 1911, maturing on July 1, 1914, and bearing interest at the rate of five per cent per annum; and should also issue and dispose of certain participation shares; that with the moneys derived from the sale of those notes and the participation shares, the trustees were to pay for the stocks and securities that Blair had contracted to purchase, and certain expenses connected with the organization of the Collateral Trust. On maturity of those collateral notes, the trustees were authorized to issue renewal or other notes, and to pledge the stocks and securities in order to obtain the money with which to pay the original notes.

The Collateral Trust provided that the trustees might, in their discretion, sell or exchange all or any part of the trust estate; that they should have power to vote all shares of stock at any and all meetings of the stockholders, and to vote in favor of the sale or lease of the physical property of the corporations, and to have the right to vote in favor of consolidating or merging any of the corporations whose shares of stock might be comprised in the trust estate with any other such corporation; ''to borrow money from time to time and to issue notes, bonds or other evidences of indebt-

edness, either secured or unsecured, and for such purpose to mortgage, pledge or otherwise incumber the whole or any part of the trust estate, * * * as they may determine." And "to deal with the trust estate and to manage and conduct the trust hereby created * * * as fully as if the trustees were the absolute owners of the trust estate."

It also provided for the creation by the trustees of a governing committee to be composed of Vanderlip, McRoberts, Insull, Blair, Cobe, Harden and Delano, and that none of them need be the holder of any of the participation shares. It also provided for the creation of an executive committee to be composed of not less than three nor more than five members of the governing committee, and that the first members of the executive committee should be Insull, Blair and Cobe, and that the executive committee should continue in office until the $30,000,000 of collateral notes were paid in full and the indenture given to secure them satisfied by the trustees. It also provided that without the approval of the trustees no meeting of the participation shareholders should be held until the payment in full of all the original collateral notes, and that after the payment of those notes, and any obligation which might be issued in renewal thereof, the participation shareholders might remove the trustees, or any of them, and fill any and all vacancies created by such removal. It also provided that the trustees should have power, in their absolute discretion, subject to the collateral notes of July 1, 1911, to sell, assign, transfer and exchange all or any part of the trust estate, as they might determine; and that upon the termination of the Collateral Trust, which might be at any time within twenty-one years after the death of the last survivor of the original members of the governing committee, the trustees should be required to sell the assets of the trust estate and distribute the proceeds, after the payment of expenses

and debts of the trust, giving, first, par and unpaid dividends to the preferred participation shares, and the balance ratably among the holders of the common participation shares.

Purporting to act under the provisions of the Collateral Trust of June 30, 1911, the then acting trustees, Vanderlip, Blair and McRoberts, entered into a certain indenture dated July 1, 1914, with the Illinois Trust & Savings Bank, whereby they transferred to the Illinois Trust & Savings Bank, as trustee, all of the above-described shares of stock of the three above-mentioned elevated railways (hereinafter called "Divisional Corporations") to secure the payment of the principal and interest of $14,000,000, the face value of the notes of the trustees of the Collateral Trust, due July 1, 1916, said notes being designated "Chicago Elevated Railways Two Year Five Per Cent Gold Notes" (hereinafter called "Gold Notes"). On July 1, 1916, at their maturity, said Gold Notes being unpaid, $13,636,000 of them were extended until July 1, 1919, and their interest rate increased to six per cent per annum. That was the result of an extension agreement, dated June 19, 1916, between the trustees of the Collateral Trust, the Illinois Trust & Savings Bank, as trustee, and the holders of the Gold Notes. Under that extension agreement, certain additional notes of the divisional corporations, aggregating $1,070,000, and an indebtedness, for electrical power of the three divisional corporations to the Commonwealth Edison Company, of $1,524,597.21, and an undivided interest in a certain indebtedness of $523,192 for electrical power, were pledged as additional security.

Also, on July 1, 1914, the trustees of the Collateral Trust issued and delivered $7,000,000 of debentures, payable ten years after date, with interest at the rate of six per cent per annum, on which no interest has been paid since January 1, 1919. Nothing has been

paid on the principal, of the $13,636,000 of notes which were due July 1, 1919, and no interest has been paid thereon since that date.

According to the terms of the Collateral Trust agreement of June 30, 1911, the trustees of the Collateral Trust, as the owners and holders of record of all the outstanding capital stock of the divisional corporations, have had the voting right of all that stock, including the right to elect directors of the divisional corporations, to the exclusion of the shareholders of the Collateral Trust either to vote or to prescribe the manner of voting by the trustees, and, as a result, it is alleged the trustees on or prior to July 1, 1914, under the Collateral Trust, "unlawfully held all of the outstanding shares of capital stock of said divisional corporations, in violation of the laws of the State of Illinois; that the purported pledge by said trustees of all of the outstanding shares of the capital stock of said divisional corporations to the Illinois Trust & Savings Bank under the indenture dated July 1, 1914, as aforesaid, was therefore unlawful, void and without effect."

The Illinois Merchants Trust Company (formerly the Illinois Trust & Savings Bank), as trustees under the trust indenture of July 1, 1914, securing the $14,000,000 of Gold Notes, gave public notice that on October 3, 1923, it would sell at a certain advertised public place in New York City the stock certificates representing all the shares of the capital stock of the Divisional Corporations pledged by the trustees of the Collateral Trust to the Illinois Trust & Savings Bank on July 1, 1914, and it is alleged that, although the pledge to the Illinois Merchants Trust Company was unlawful, the Illinois Merchants Trust Company, unless restrained by the court, will make such sale, to the irreparable injury of the complainants and the other holders of preferred participation shares of the Collateral Trust.

The complainants state that they "are informed and believe and therefore upon such information and belief represent" that Vanderlip, McRoberts, Blair, Insull, Beale and the United States Mortgage & Trust Company, while acting as trustees of the Collateral Trust, conspired and confederated with each other and with officers and directors of the Commonwealth Edison Company, and with Insull, Doyle, Budd, Fox and Gulick, and with Mitchell, Mason, Clinch and Reynolds "to so manage and control said Chicago Elevated Railways Collateral Trust and through their purported ownership as said trustees of all the shares of capital stock of said Divisional Corporations, to so manage and control said Divisional Corporations, that said Commonwealth Edison Company and the holders of the Gold Notes would eventually obtain ownership and control of said Divisional Corporations, in violation of their duties and obligations as trustees" of the Collateral Trust to the complainants and holders of participation shares; that, during the existence of the Collateral Trust, Insull was president of the Commonwealth Edison Company, and that Beale was one of the attorneys for the Commonwealth Edison Company; that, since 1917, the directors of all the Divisional Corporations have been the same persons, that is, Insull, Doyle, Budd, Fox and Gulick; that Fox and Gulick are vice presidents of the Commonwealth Edison Company, of which Insull is president; that since November 13, 1911, Insull has been receiver of the Chicago & Oak Park Elevated Railroad Company in a case pending in the United States District Court; "that in each and every instance in which new trustees were appointed, same appointment was made by their, or his, or its predecessor or predecessors, with intent to carry out and further the plan and conspiracy herein described"; that the trustees, officers and directors so managed the Collateral Trust that "large expenditures" were made by the divisional corporations

for unnecessary additions and alterations; that the trustees made unauthorized loans from the trust funds to Insull, as receiver of the Chicago & Oak Park Elevated Railroad Company, and have bought receiver's certificates, etc., to the prejudice of the shareholders of the trust; that, as a result, the divisional corporations were unable to pay interest on the Gold Notes or debentures, and the debt to the Commonwealth Edison Company grew large and remained unpaid, and it became difficult to finance the Gold Notes when they fell due.

It is stated that "by virtue of these actions and the resulting financial condition of said trust, the representatives of the Gold Note holders have proposed and are attempting to consummate a plan and agreement of reorganization, attached hereto and marked 'Exhibit B,' which is to reap the harvest of said conspiracy hereinbefore described''; that the plan and agreement dated July 14, 1923, is between holders of Gold Notes and holders of the debentures, parties of the first part, and Mitchell, Reynolds, Mason and Clinch as representatives of the holders of the Gold Notes, parties of the second part; that the plan and agreement has been published, and by it, it appears, as the complainants "are informed and believe and therefore aver, that said committee will acquire all of the stock, bonds, securities, and other assets of said Chicago Elevated Railways Collateral Trust for transfer, assignment and delivery to a consolidated corporation to be formed to take over the properties of the Elevated Railroad Company," without reference to the value of said assets of the Collateral Trust, and "in derogation and to the irreparable damage and injury of your orators and other holders of preferred participation shares of said Chicago Elevated Railways Collateral Trust."

It is stated that complainants "are informed and believe and therefore represent" that the proposed

consolidated corporation, under the aforesaid plan and agreement, will have a common capital stock of 203,295 shares, each of the par value of $100, and that the Commonwealth Edison Company will acquire 101,795 shares—or a majority of said stock—which will be transferred and delivered to it by said committee under the plain and reorganization agreement "as partial consideration for the surrender by said Commonwealth Edison Company of said items of indebtedness owing by the divisional corporations" to it, which was allowed to remain unpaid by the various defendants as hereinbefore described, and for the purpose of giving control to the defendant, Commonwealth Edison Company, as hereinbefore described, namely: $502,218.38 for electrical energy supplied the Metropolitan Elevated from July 1, 1916 to December 31, 1918, an unknown undivided interest in a like debt of $523,192 incurred between December 31, 1918 and July 1, 1919 by the divisional corporations; claims, amount unknown, of the Commonwealth Edison Company against the receiver of the Oak Park Elevated Railroad on certificates and for electrical energy; certain unmatured mortgage bonds and notes of the latter road, amounting to $1,600,000, with a market value of $1,100,000; that such acquisition of the controlling interest in a corporation to be formed "is the culmination of said conspiracy."

It is stated that the defendants representing the Gold Note holders, in pursuance of an illegal purpose and to consummate the proposed consolidated corporation, caused the Illinois Merchants Trust Company, as trustee for the Gold Notes, to offer to sell the pledged assets on October 3, 1923; that the trustees of the Collateral Trust and the representatives of the Gold Note holders, defendants, "in furtherance of their plan to secure these properties for themselves, have purposely withheld the earnings of the divisional corporations" and only published consolidated returns, including

large losses on the part of the Oak Park Elevated Railways, thus keeping the public and the complainants in ignorance of the value of the pledged assets, so that there would be no one to bid against the Gold Note holders at the advertised sale; and making, thereby, such sale illegal and one that will cause irreparable damage to the complainants unless enjoined.

It is stated that the trustees under the Collateral Trust have acquired as additional assets the following: $208,000, five per cent Northwestern Elevated Railroad Company bonds; $15,000 in notes of the Chicago & Oak Park Elevated Railroad Company; $105,-000 cash and cash items; $12,292,000 Northwestern Elevated Railroad Company bonds which were deposited in escrow under a deed of July 1, 1914; stock of and various claims against the Chicago & Oak Park Elevated Railroad Company subordinate to liens on that property for $4,157,862.99, and certificates of the latter company of an unknown value, none of which has been pledged, and that unless a receiver is appointed they will be dissipated; that the trustees of the Collateral Trust in concert with the protective committee for the Gold Note holders, in furtherance of said conspiracy, have so arranged it that the committee may purchase the pledged assets and leave a deficiency, and then appropriate the unpledged assets in full or partial satisfaction of the deficiency, unless enjoined or a receiver is appointed.

It is stated that further evidence of the conspiracy to let the Commonwealth Edison Company acquire control of the voting securities of the new consolidated corporation is shown by the fact that, under the plan, the former company agrees to deliver certain odd lots of bonds and equipment notes of the divisional corporations, none of which is in default, and the delivery of which does not lessen the funded debt of the new consolidated corporation; that the proposed total capitalization of the new consolidated corporation is

$87,196,500, whereas, according to the figures of the note holders' committee, based on a valuation of the Public Utilities Commission's valuation as of June 30, 1919, the value of the properties is $89,514,932, leaving an equity of $2,318,432, for which no securities are to be issued and which should belong to and be paid over to the participation shareholders; that the net earnings of the Collateral Trust for the first eight months of 1923 have been very substantial and prove that the lines are being very profitably operated and the profits sufficient to pay the running indebtedness, funded and otherwise, and leave a substantial surplus; that the properties of the Collateral Trust have "a very bright and immediate future by reason of the tremendous development of the outlying districts," of Chicago; that, in view of the present earnings, the trustee could have refinanced the indebtedness now in default had it not been for the illegal conspiracy referred to; that if a new trustee or a receiver is appointed it will be possible to give the preferred participation shareholders a substantial equity; that otherwise they will get nothing.

In the amendment to the bill it is stated that ninety per cent of the Gold Notes have been deposited with the note holders' committee; that the sale on October 3, 1923, will be held at the direction of that committee; that the Illinois Merchants Trust Company in the conduct of the sale is merely the agent of Mitchell, Reynolds, Mason and Clinch; that the latter have conspired and confederated with Insull and the United States Mortgage and Trust Company to give the Commonwealth Edison Company control of the proposed new consolidated corporation; that the committee will be the sole bidders at the sale; that, although the stocks of the Divisional Corporations have an actual value greatly in excess of the Gold Notes and the debentures and interest, unless the contemplated sale is restrained, the committee representing the Gold Note

holders will purchase all of the stocks at a greatly inadequate amount, leaving a deficiency for which the additional pledged securities, under the extension agreement, will then be sold, and purchased by Mitchell, Reynolds, Mason and Clinch for a grossly inadequate amount; that there then will still be a deficiency for which all the unpledged assets will be taken over and transferred to the new corporation, thus depriving the complainants and other preferred participation holders of their equitable rights; that none of the stock of the Divisional Corporations can be purchased in the open market; and so when sold as aforesaid there will remain no adequate relief at law.

The subject of this appeal is the right of the complainants, on the face of their bill of complaint and amendment, to an injunction *pendente lite* to restrain the defendant Illinois Merchants Trust Company from selling or attempting to sell at public or private sale any of the stocks, securities or other property or assets of the Collateral Trust which were pledged to the Illinois Trust & Savings Bank by the trustees of the Collateral Trust under a trust indenture of July 1, 1914, and an extension agreement dated June 19, 1916.

Two substantial questions arise: First, do the allegations of the bill as amended sufficiently show participation by the Illinois Merchants Trust Company, as trustee, in an illegal conspiracy; second, was the holding of all the capital stock of the Divisional Corporations by the trustees of the Collateral Trust, with complete and sole power and discretion to vote those stocks without direction from the beneficial owners, illegal, and, as a consequence, the transfer and assignment of those stocks to the Illinois Trust and Savings Bank (succeeded by the Illinois Merchants Trust Company) as trustee, to secure the payment of the Gold Notes, invalid?

First. It is alleged that Vanderlip, McRoberts, Blair, Insull, Beale and the United States Mortgage &

Trust Company, as trustees, conspired and confederated with each other and with the officers and directors of the Commonwealth Edison Company, and with Insull, Doyle, Budd, Fox and Gulick, directors of the Divisional Corporations, and with Mitchell, Mason, Clinch and Reynolds, the committee of the note holders, so to manage and control the Divisional Corporations that the Commonwealth Edison Company and the Gold Note holders would eventually obtain ownership and control of the Divisional Corporations "in violation of their duties and obligations as trustees" of the Collateral Trust to the holders of participating shares.  In addition to that generalization, it is stated that during the existence of the Collateral Trust, Insull and Beale were, respectively, president and attorney of the Commonwealth Edison Company; that, since 1917, Insull, Doyle, Budd, Fox and Gulick have been the directors of the Divisional Corporations; that Fox and Gulick are vice presidents of the Commonwealth Edison Company; that Insull has been receiver of the Chicago & Oak Park Elevated Company.  And then, that whenever a new trustee was appointed he was named by his predecessor "with intent to carry out and further the plan and conspiracy herein described."  So far no facts are recited as the source or foundation for the alleged opinion or conclusion.  It is merely stated dogmatically that they occupied certain positions and conspired "to so manage and control" the Collateral Trust and the Divisional Corporations that the Commonwealth Edison Company and the holders of the Gold Notes "would eventually obtain ownership and control of the Divisional Corporations."  That, of course, is an expression of opinion, charging conspiracy without stating facts.

The official history of the Collateral Trust and the Divisional Corporations is set forth.  It is stated that Gardner, Dumaine and Hart were on June 30, 1911,

the original trustees of the Collateral Trust; that in the same year they were succeeded by Vanderlip, McRoberts and Blair, who remained trustees until sometime in 1915, when they were succeeded by Insull, Beale and McRoberts; that from 1916 to 1923, Insull and Beale were the trustees, and that upon the death of Beale in 1923, Insull became the sole trustee and shortly thereafter the United States Mortgage & Trust Company became the sole trustee on appointment by Insull. It is stated that Insull, Doyle, Budd, Fox and Gulick were continuously the directors of the Divisional Corporations. From the foregoing it appears that although Insull was a director of the Divisional Corporations he did not become one of the trustees of the Collateral Trust until sometime in the year 1915; whereas, the pledge of the stocks to secure the $30,000,000 of collateral notes occurred on July 1, 1911, and the pledge of the stocks to secure the $14,000,000 of Gold Notes occurred on July 1, 1914, when Vanderlip, Blair and McRoberts were the trustees. Quite obviously no obnoxious inference necessarily arises from the mere statement of the roster of the trustees of the Collateral Trust during the past twelve years of its history. *Dady v. Georgia & A. Ry. Co.*, 112 Fed. 838.

It is stated that the trustees of the Collateral Trust and the representatives of the Gold Note holders, in furtherance of their plan, "have purposely withheld the earnings of the Divisional Corporations  *  *  * that said trustees have only published the earnings of said corporations in a consolidated return," and, as a result, the public and the complainants have been kept from knowledge of the value of the pledged assets, in order that there would be no one to bid against the bidders of the Gold Notes at the sale. There is no allegation, however, that the complainant ever asked the trustees or any official of the companies for any information concerning their accounts

and earnings, or that any such request has been refused.

It is alleged that "large expenditures were made by the Divisional Corporations for unnecessary and improvident extensions, alterations and additions," as the result of which, the trustees were deprived of moneys, which they otherwise would have had, to pay interest on the $14,000,000 in notes. The amount of the expenditures is not stated, even approximately, nor what the additions and alterations were, or in what way they were unnecessary, or how they were paid for, or whether they were paid for out of earnings or borrowed money. It is not sufficiently definite to precipitate an issue.

It is alleged that the trustees made unauthorized loans from the trust funds to Insull, as receiver of the Chicago & Oak Park Elevated Railroad Company, and bought receiver's certificates, to the injury of the participating shareholders. No amounts, even approximate, are mentioned. It is stated that, as a result, the Divisional Corporations were unable to pay the interest on the Gold Notes and debentures. That, it will be seen, is a mere deduction from the former generalization. The amount of such advances or when they were made, or whether the receiver is unable to repay them, or whether they have been actually paid, is not stated. And, further, the Collateral Trust agreement, to which the participating shareholders are parties, expressly authorizes the trustees to loan money from the trust estate on such terms as the trustees may approve, and to invest "in any securities which the trustee may select or approve." Also, the Collateral Trust itself shows that the acquisition of the securities of and claims against the Chicago & Oak Park Elevated Railroad Company, by the trustees, was contemplated and intended, so that the foregoing allegation, in addition to being mere generalization, is no evidence whatever of fraudulent acts. Then

130    APPELLATE COURTS OF ILLINOIS.

Felt et al. v. U. S. Mortgage & Trust Co., 231 Ill. App. 110.

again, the plan and agreement of July 14, 1923, and the allegations of the bill of complaint indicate that the advances that were made to Insull as receiver for the payment of interest on $4,432,000 of mortgage bonds due July 1, 1923, were to pay interest on bonds which were guaranteed by the Northwestern Company, and that the trustees, purporting to hold and own all of the capital stock of the Northwestern Company, would be expected to provide for interest on those underlying bonds, in order to avoid a judgment against the Northwestern Company for their principal and interest. It follows, therefore, that the allegations on that subject are too general, and evidence of just care and diligence, rather than negligence and wrongdoing.

It is alleged that owing to the financial condition brought about by the above-described conduct, the representatives of the holders of the Gold Notes and debentures have proposed and intend to consummate a plan of reorganization, "to reap the harvest of said conspiracy." That is a still more remote generalization. The details of the published plan of reorganization, dated July 14, 1923, which is for the Illinois Merchants Bank to offer at public sale on October 3, 1923, the securities pledged with it, is then set forth.

The prospective reorganizaztion which may or may not be consummated and which is entirely dependent upon the committee representing the holders of the Gold Notes, through the Illinois Merchants Trust Company becoming the successful bidder at the advertised sale of the securities, contemplates a new consolidated corporation which will have a common capital stock of 203,295 shares, each of the par value of $100, of which there will be transferred by the committee 101,795 shares as a consideration for the surrender by the Commonwealth Edison Company of certain items of indebtedness due to it from the Divisional Corporations and the turning over by the Common-

wealth Edison Company to the committee of certain claims of the Commonwealth Edison Company against the receiver of the Oak Park Elevated Railroad, and also certain unmatured bonds and notes of the latter road, amounting to $1,600,000. It is then stated that the acquisition by the Commonwealth Edison Company of the controlling interest in the new consolidated corporation, if the bid at public sale on the part of the note holders is successful, "is the culmination of said conspiracy." That, however, is all *in fieri*. Although it is not specifically alleged that the $14,000,-000 of Gold Notes which were issued on July 1, 1914, by the trustees of the Collateral Trust constituted part of the original $30,000,000, yet considering the various transactions as recited in the bill of complaint as amended and the exhibits, it seems but reasonable to consider the $14,000,000 as an unpaid part of the original $30,000,000. Under those circumstances, the Collateral Trust, at its inception, having actually received the original proceeds of the Gold Notes, in order, it may reasonably be assumed, to pay at least in part for the stocks of the Divisional Corporations and being assented to and sanctioned by both stockholders and the participation shareholders, no charge of conspiracy or wrongdoing can be said to arise as the result of any inference therefrom. And, further, the Collateral Trust having actually received the money, the complainants as participating shareholders, after giving their assent and sanction, will not be allowed to stultify themselves by claiming that the Collateral Trust can retain the stocks of the Divisional Corporations and at the same time repudiate and thus destroy the security for the debt which was incurred in their original purchase.

It is alleged that on July 1, 1916, $13,636,000 of Gold Notes being unpaid, they were extended until July 1, 1919, and their interest rate increased to six per cent per annum, and that as a result of an extension agree-

132    APPELLATE COURTS OF ILLINOIS.

Felt et al. v. U. S. Mortgage & Trust Co., 231 Ill. App. 110.

ment dated June 19, 1916, between the trustees of the Collateral Trust, the Illinois Trust & Savings Bank, as trustee, and the holders of the Gold Notes, said notes of the Divisional Corporations, aggregating $1,070,000, an indebtedness of $1,524,597.21 of the three Divisional Corporations to the Commonwealth Edison Company for electrical power, and an undivided interest in a certain indebtedness of $523,192 for electrical power, were pledged as additional security. It is not stated that the added securities pledged under the extension agreement were unnecessary to secure the outstanding Gold Notes, nor is it stated that the $7,000,000 of debentures which were issued on July 1, 1914, payable ten years after date, upon which no interest has been paid since January 1, 1919, were unnecessary, or that the trustees of the Collateral Trust did not receive therefor a proper *quid pro quo.*

It is alleged that as far as the prospective sale is concerned, which was set for October 3, 1923, the Illinois Merchants Trust Company was merely the agent of Mitchell, Reynolds, Mason and Clinch, and that they have conspired with Insull and the United States Mortgage & Trust Company to give the Commonwealth Edison Company control of the proposed new consolidated corporation, and that the committee will be the sole bidders at the sale, and that when the sale takes place the Gold Note holders will purchase all the stocks at a grossly inadequate amount, leaving a deficiency, by which all the remaining securities will be disposed of.

It will be observed that it is merely charged, as far as the Illinois Merchants Trust Company is concerned, the appellant here, that in the conduct of the sale, it is merely the agent of Mitchell, Reynolds, Mason and Clinch. No facts are alleged and no reasons given; it is a mere statement of opinion upon which a court of equity would not be entitled to act affirmatively and issue a restraining order.

It is alleged that the contemplated sale by the trustee and the possible or probable purchase by the noteholders' committee, and then the probable carrying out of the proposed plan of the new consolidated corporation which may possibly or probably result in the Commonwealth Edison Company becoming the owner of the major part of the final equity in the new consolidated corporation, being represented by a majority of its stock, the value of which equity at most is uncertain, is evidence of some conspiracy, but, as we have already said, that is all *in fieri,* and it may or may not be consummated, and in and of itself it is no evidence whatever that in the twelve years that have elapsed since the Collateral Trust was created any unlawful act on the part of any of the defendants has taken place.   With the inferences to be drawn from the proposed plan of reorganization eliminated, quite obviously the remaining charges are all too vague and general to justify a court of equity in acting affirmatively.   Further, even the proposed plan provides that underlying securities to the extent of $46,704,000 shall remain undisturbed and that there shall be issued to the committee in exchange for the cancellation of the stocks of the three Divisional Corporations and certain notes and other debts, amounting to a little over $3,000,000, the following:   First Lien and Refunding Mortgage bonds, $1,400,000; Adjustment Debenture bonds, $16,380,000; and common stock or trust certificates in the sum of $10,150,000, out of a total new capital stock of $20,329,500, and that, presumably, the Commonwealth Edison Company will get common stock or trust certificates to the extent of $10,179,500, and about $2,383,000, in First Lien and Adjustment bonds, for the surrender by it of certain claims and securities amounting, approximately, to $5,670,000, from which it quite obviously appears that even if for the benefit of the complainants' contention the most favorable inference be drawn, the Commonwealth Edi-

son Company will obtain for what is due it from the Divisional Corporations and the Chicago & Oak Park Elevated Railroad Company a somewhat remote equity, the value of which will be dependent upon the future success of the proposed consolidated corporation. All that, as a possibility, and being dependent upon the committee becoming the successful bidder at a future public sale, is no evidence whatever of anything unlawful or of a conspiracy or of fraud.

There are many statements in the reports in this State announcing the general principles applicable to such a pleading as that involved herein. In *Ravlin v. Chicago, A. & DeK. R. Co.,* 297 Ill. 130, the court said: "It is true that when one assails as fraudulent certain transactions, the complaining party must plead specific acts or facts relied on to establish the fraud." In *Smith v. Brittenham,* 98 Ill. 188, the court said: "Charges of fraud should not be general, but the facts should be stated on which the charges are based." In *Newell v. Bureau County,* 37 Ill. 185, the court said: "The charges of fraud and usury are general, and do not show the facts on which the charges are predicated, consequently it would be impossible to answer them. That such and such facts constitute fraud or usury, as the case may be, may be but an inference drawn by the plaintiff from the facts, and as such inferences are not admitted by the demurrer, the facts must be distinctly charged." In *Murphy v. Murphy,* 189 Ill. 360, the court quoted, with approval, from *Haenni v. Bleisch,* 146 Ill. 262, the following: "In alleging fraud it is well settled, both at law and in equity, that the mere general averment, without setting out the facts upon which the charge is predicated, is insufficient. * * * It is essential that the facts and circumstances which constitute it (the fraud) should be set out clearly, concisely, and with sufficient particularity to apprise the opposite party of what he is called upon to answer." Citing 9 Encyc. of Pl. & Pr.,

pp. 686, 687; *Brooks v. O'Hara Bros.*, 8 Fed. 529; *Jones v. Albee*, 70 Ill. 34; *Klein v. Horine*, 47 Ill. 430. In *Doose v. Doose*, 300 Ill. 134, the court said: "While it is charged that the solicitor for the complainant entered into an agreement and conspiracy with the solicitors for the defendant, and that the decree is a culmination of a collusive and fraudulent agreement between them to deprive the complainant of his property, no facts are alleged on which to base the charge. An allegation of conspiracy, collusion and fraud must show the facts upon which it is based. The words themselves, unsupported by facts, are mere vituperation." See Mitford Chancery Pleading, 4th Amer. ed., p. 71.

The Illinois Merchants Trust Company, trustee, representing the holders of nearly $14,000,000 of Gold Notes, and the note holders themselves, have rights as well as the participating shareholders of the Collateral Trust, and a restraining order should not be entered unless a cause of action is stated. Daniell's Chancery, 6th ed., p. 321, and notes. Considering each allegation and giving it full scope as far as it is an allegation of fact, and then bearing them all in mind and co-ordinating them, as far as possible, as a statement of a cause of action, it is impossible reasonably to conclude that sufficient is stated as definite fact—and not merely as opinion and suspicion—to justify the court in issuing the injunction.

After a careful analysis of the bill of complaint as amended, it is our judgment that it does not sufficiently show, on the part of the Illinois Merchants Trust Company, as trustee, participation in a conspiracy to injure the complainants and other participating shareholders.

Second. Is the Collateral Trust by reason of the voting power given the trustees, to that extent, illegal. Article II, sec. 6, of the Collateral Trust recites: "Anything to the contrary herein notwithstanding, no

right to vote or to prescribe the manner or method of voting in respect to any of the securities comprised in the trust estate shall exist in any of the shareholders." Article III, sec. 1, recites: "The trustees shall hold the legal title to the trust estate and, in addition to the other rights, privileges, authority and powers hereby conferred upon them, they shall have the power in their discretion: (a) To manage and control the trust estate; (b) to vote in person or by proxy at any and all meetings, general or special, of stockholders upon all shares of stock held hereunder on any and all matters coming before said meetings * * * all as the trustees in their absolute discretion shall determine." By article III, the trustees are given practically complete and absolute power in regard to all the stock held under the Collateral Trust, as though they were both the legal and equitable owners of it. It may be that it was intended by the Collateral Trust to give the trustees exhaustive power over all the stock—including all voting rights—in order to constitute them principals, free from control by the participating shareholders, thus creating a pure trust as distinguished from a copartnership. Fletcher, Cyc. Corp., sec. 6059. But, even as principals, they were trustees, and there is no such entity known to the law as a trust without a beneficiary. It is true that trustees frequently have legal authority to buy and sell, to borrow and lend, and do many important things with the *res* of the trust without the actual consent of the beneficiary, but the question arises here whether the trustees under the Collateral Trust, holding the stock of the Divisional Corporations and invested with all its voting rights, could exercise the latter without the consent of the trust's beneficiaries, and not act contrary to the constitution and the law of this State.

Here, as the three trustees, prior to July 1, 1914, under the Collateral Trust, held all the outstanding capital stock of the Divisional Corporations and,

alone, had the sole voting right of that stock, including the right to elect the directors of the Divisional Corporations, to the exclusion of the participating shareholders, the sole beneficiaries of the trust, may it be said that they—as trustees, who, further, did not have, as a matter of necessity, any substantial or pecuniary interest in the stock—did not constitute, as to the stock of each divisional corporation, an illegal voting trust?

The Collateral Trust purports to create a legal entity which shall legally own and conduct the three divisional corporations for certain beneficiaries called participating shareholders. It is not in its essence a combination of stockholders for the management of a single corporation, such as the conventional voting trust; nor is it a combination of competing institutions.

It is provided in article XI of the Constitution that it shall be provided by law "that in all elections for directors or managers of incorporated companies, every stockholder shall have the right to vote, in person or by proxy, for the number of shares of stock owned by him, for as many persons as there are directors or managers to be elected, * * * and such directors or managers shall not be elected in any other manner."

In *Venner v. Chicago City Ry. Co.,* 258 Ill. 523, one Venner, who owned 200 shares of the capital stock of the Chicago City Railway Company, filed a bill on January 22, 1910, for the purpose of having declared illegal and void a certain collateral trust, dated January 1, 1910, involving the capital stock of five street railway corporations, on the ground that by the collateral trust agreement the stockholders of the Chicago City Railway Company irrevocably deprived themselves of their rights as stockholders and divested themselves of all control of the corporation and placed its management in the hands of strangers. The court held, however, that as the management of

the corporations was in the hands of their directors, who were elected annually by the trustees of the Collateral Trust, according to the direction of a committee selected by the participation shareholders who were the beneficial owners of the stock, there was in reality an election by the stockholders through their proxies, that is, by their agents (the aforesaid committee), who had power to act for them, and that the Collateral Trust was therefore legal. In that case the court said that an agreement is invalid if "the stock of the corporation is to be voted or its affairs managed by the determination of persons other than its stockholders or by a minority of its own stockholders." Citing *Guernsey v. Cook,* 120 Mass. 501; *Shepaug Voting Trust Cases,* 60 Conn. 553; *Kreisel v. Distilling Co. of America,* 61 N. J. Eq. 5; *Cone v. Russell,* 48 N. J. Eq. 208; *White v. Thomas Inflatable Tire Co.,* 52 N. J. Eq. 178; *Morel v. Hoge,* 130 Ga. 625; *Hafer v. New York, L. E. & W. R. Co.,* 9 Ohio Dec. (reprint) 470.

In *Luthy v. Ream,* 270 Ill. 170, the court said:

"While the pooling of stock for the purpose of electing directors and officers and controlling the management and business of the corporation is not necessarily illegal, an agreement, the purpose and effect of which are to permit the affairs of the corporation to be managed by the determination of persons other than its stockholders or by a minority of its own stockholders, is invalid."

It would seem, therefore, that the Collateral Trust, in so far as it invested the trustees with all the voting power of the stocks of each of the Divisional Corporations, free from any and all authority on the part of the beneficial owners, was illegal. It is argued, however, that the voting power was vested in the trustees to further secure the notes issued under the Collateral Trust; that the trustees hold that voting power for the benefit of the note holders, and that the voting

power of the stocks continues only so long as the notes remain unpaid, and that the right is expressly reserved to the participation shareholders to put in their own trustees and thereby terminate the trust after the notes are paid.    That, however, does not change the fact that all the voting power was taken from the beneficial owners of the trust, and that the stock of each of the Divisional Corporations, to quote again the language of Mr. Justice Dunn in the *Venner* case, "is to be voted or its (that is, the corporation's) affairs managed by the determination of persons other than its stockholders or by a minority of its own stockholders."    But, does it follow, even then, as contended by counsel for the complainants, that the transfer or assignment of the stocks of the Divisional Corporations to the Illinois Merchants Trust Company, as trustee, to secure the payment of the Gold Notes, issued under the trust indenture of July 1, 1914, was illegal?    We think it does not.    The complainants sue here as participating shareholders, and not as nonassenting stockholders to the creation of the Collateral Trust.    They became, voluntarily, parties to the Collateral Trust agreement.    As we have already said, under the circumstances, the Collateral Trust having received, when it first came into being, the original proceeds of the Gold Notes, no participating shareholder is now entitled to dispute the legality of the original transaction.    The pledging of the stocks and securities of the Divisional Corporations with the Illinois Trust & Savings Bank, to secure the original notes, as well as the making of those notes and the renewals thereof, was not done pursuant to action by the trustees of the Collateral Trust, as a result of the votes of such trustees, of the stocks of the Divisional Corporations, either independent of or contrary to the wishes of the beneficial owners of those stocks, namely, the participating shareholders, but, on the contrary, the action of the trustees in so pledging

those stocks and securities was pursuant to the express provisions of the Collateral Trust agreement and the express directions therein contained, to which the participating shareholders were direct parties.

Moreover, by what right do the complainants, as participating shareholders, now ask a court of equity to grant them relief, based upon the trust which they voluntarily chose and which they now claim is illegal? The trust is made up of all the interests of the participating shareholders. The complainants own between them 545 shares of the total of 160,000 preferred participation shares, and to that extent are interested in the trust. When they became owners is not stated. Each participating certificate on its face stated that the provisions of the Collateral Trust were part of it. The trustees of the Collateral Trust held the legal title to all the property of the trust. If then the trust is to be considered as an illegal institution, must not the complainants be considered as participants therein, and, being with the trustees *in pari delicto*, how are they able to obtain standing in a court of equity? As we view the law, the participants in an illegal trust, one which they contend is illegal, have not the right to come into a court of equity and ask that some of the things which have been done in the course of the history of the trust, as, for example, the pledging of the securities to secure the notes in question, shall be set aside; in other words, ask a court of equity to help them undo something which they claim the trustees had no right to do, but which they expressly authorized, especially when that which they ask is for their own profit and to the detriment of a third party. The complainants, according to the argument of their counsel, took part in an illegal contract, and now do not seek to overturn that contract, but to be relieved against it; that is, to obtain some benefit from it by injunction, receivership, and an accounting and distribution of the assets. If they were suing as

stockholders of one of the Divisional Corporations, and not as assenting participating shareholders, it would give rise to a different question, but, as participants in the trust itself, they come to equity for some benefit which they can get only on the ground that the trust be recognized and affirmed. Although alleging that their own trustees "on and prior to July 1, 1914, unlawfully held all of the outstanding shares of the capital stock of said Divisional Corporations in violation of the laws of the State of Illinois," they now ask that their own trust in which they are participants by reason of their participation shares, which alone give rise to all their rights, be declared null and void, and that in part, at least, for their benefit, the illegal trust be allowed to get back the stocks it has pledged and upon which money was advanced many years ago —and all for the benefit of the illegal trust. The acts of an illegal institution are not to be condoned and relieved against at the suit of those interested and participating therein.

In *Unckles v. Colgate,* 148 N. Y. 529, where a holder of certificates of trust issued by the National Lead Trust sought to obtain a judgment for the winding up of the trust and an accounting as to defendants, who were trustees under the trust agreement, and for the appointment of a receiver and a distribution by him of all the properties which came into the defendants' hands—the complaint being demurred to—the court said: "The plaintiff here voluntarily became a participant in a scheme which he alleges to have been illegal, by acquiring the trust certificates subsequently to the formation of the trust." In its opinion the court distinguishes between a suit as a stockholder on the one hand and the voluntary holder of a trust certificate on the other, and states that the holder of the trust certificate has not the excuse of the stockholder, and then says:

"What interest has the plaintiff, other than that

which his certificate suggests, namely, a proportionate interest as a beneficiary in the trust scheme? He could not well lay claim to the ownership of any stocks or property originally surrendered to the trustees. He acquired certificates, which represented the amount of his interest in the trust and which contained a stipulation binding him as a shareholder to all the terms of the trust agreement. He thus, voluntarily, made himself a party to the scheme under an executed agreement, which he alleges to have been illegal, and how can he now say that it is one which he can disaffirm, and as to which, upon the plea of disaffirming, he can ask a court of equity to intervene and to compel in his favor an accounting and distribution by the trustees? I think the court might well apply the principle which controls in cases where parties are *in pari delicto,* and hold that it would not and that no public policy required it to interfere.    *    *    *
The obligation, which plaintiff claims the defendants to be under, springs out of the trust agreement. If that agreement was illegal and created no obligation which the court would recognize or enforce, it cannot be that the law would, nevertheless, imply some valid agreement between the trustees and the plaintiff, which he could assert and ask a court of equity to enforce in his behalf.''

Of course, it follows that if a suit would not lie by the complainants against the trustees of the Collateral Trust, all the parties being *in pari delicto, a fortiori,* a court of equity is not entitled to enjoin the Illinois Merchants Trust Company from selling the securities it received from the trustees of the Collateral Trust to secure moneys advanced to the Collateral Trust. Obviously, they have no way of reaching the Illinois Merchants Trust Company, trustee of the securities— the sale of which they desire to prevent—without going through the Collateral Trust; that is, without recognizing the Collateral Trust and the conduct of their own trustees, who managed through themselves and their governing and executive committees the affairs

of the Collateral Trust. Being interested in the Collateral Trust, which they claim is an illegal entity, they are, as interested participants in the alleged conduct of that trust, *in pari delicto* with the trustees, and thus being associates in dereliction, though dissatisfied with the acts of their coadjutors, the trustees, they do not, here, come into equity with clean hands, and are not entitled to the relief which they claim; that is, an injunction to restrain the sale of the abovementioned securities.

The order and decree of October 10, 1923, therefore, will be reversed.

*Reversed.*

O'CONNOR, J., and THOMSON, J., concur.